In re SWIFT et al.

Ex parte LE ROY.

(District Court, D. Massachusetts. April 4, 1901.)

No. 2,745.

BANKRUPTCY—PROCEEDS OF PLEDGE—RECOVERY FROM TRUSTEE OF PLEDGEE.
A pledgee of a certificate of stock indorsed in blank repledged it to a bank, with other securities, to secure a debt of his own. He afterwards made a general assignment, and still later was adjudged bankrupt. The bank sold the securities, and, after its claim was paid, had a sum remaining exceeding the proceeds of such certificate, which it paid over to the assignee, who was advised by the original pledgor of his claim thereto, subject to payment of his own debt, which he had previously tendered to the assignor. The assignee deposited the money in bank, with the other funds of his trust, from which he checked, but the amount to his credit was never less than the proceeds of such certificate; and he afterwards turned over the remainder of the fund to the trustee in bankruptcy. *Held*, that the general property in the certificate or its proceeds remained in the original pledgor, and, conceding that he was estopped by his indorsement as to the bank, such estoppel extended no further than was necessary to protect the bank, and after its claim was paid the proceeds belonged to the pledgor, who could follow and recover the same from the trustee in bankruptcy, subject to payment of his debt to the bankrupt.

In Bankruptcy. Appeal from Decision of Referee James M. Olmstead.

Freedom Hutchinson, trustee, pro se.
Ropes, Gray & Gorham, for Stuyvesant Le Roy, creditor.

LOWELL, District Judge. Le Roy was indebted to Swift, and, as security for the debt, pledged a certificate of stock, indorsing the same in blank. Swift repledged the stock, together with stock of his own, to the Beacon Trust Company, as security for his own indebtedness, which greatly exceeded that of Le Roy to him. On De-

cember 27th Swift assigned to Dickson for the benefit of his creditors. On December 28th or 29th Le Roy offered to pay his debt to Swift, and demanded a return of the certificate. Swift refused to return it, saying that he was unable to do so. Between December 28th and January 2d the Beacon Trust Company sold the securities, including Le Roy's stock, paying itself out of their proceeds. After payment a balance was left in their hands exceeding the amount realized from the sale of Le Roy's stock. On January 2d Le Roy notified Dickson that the certificate was his property, and demanded that it or its proceeds should be kept separate from the general assets of Swift. On January 8th the money was turned over by the trust company to Dickson, who deposited it in the same account with money coming to him from Swift. Against this account he drew checks from time to time on account of his operations as assignee, but the balance to his credit was always in excess of the amount realized from the sale of Le Roy's stock. On April 27th Swift was adjudged bankrupt, and thereafter Dickson transferred all the funds in the account to the trustees in bankruptcy. Le Roy seeks to recover from the trustees the proceeds of the stock, less the debt due from him to Swift.

After the pledge by Le Roy to Swift, the general property in the stock remained in Le Roy, Swift having merely the rights of a pledgee. St. Mass. 1884, c. 229, does not affect the matter, even if applicable to a New Jersey corporation. The delivery of a certificate indorsed in blank to a pledgee transfers to him only the title of a pledgee, not the general property in the stock. This was not the case of a purchase of stock on a margin (see In re Swift [D. C.] 106 Fed 65), but an ordinary pledge of property to secure the pledgor's debt. It follows, therefore, that Swift had no right to repledge the stock to the trust company; that his action was wholly unauthorized, and, under the laws of Massachusetts, seems to have been criminal. Pub. St. c. 203, § 72. It is not necessary to determine if Le Roy could have brought an action of trover against Swift without a tender of some sort. Apparently, he could not. See Talty v. Trust Co., 93 U. S. 321, 23 L. Ed. 886; Cumnock v. Savings Inst., 142 Mass. 342, 7 N. E. 342. It seems, however, that the offer by Le Roy to pay Swift was, under the circumstances of Swift's reply, the equivalent of a tender, at least as against Swift. Cumnock v. Savings Inst. An action of trover then lay by Le Roy against Swift. Except as the result of estoppel, the trust company took no more title to the stock than did Swift. Save in so far as he was estopped, Le Roy could, immediately after the tender to the trust company of the amount of his debt to Swift, and a demand upon the trust company, have sued that company in trover, or, if the stock had then been sold, could have waived the tort and sued for money had and received to his use. Except for an estoppel, the proceeds of the stock in the hands of the trust company, or at any rate the surplus over Le Roy's debt, belonged to Le Roy. The facts shown in evidence do not establish an estoppel in favor of the trust company as against Le Roy, but this matter was not gone into, and counsel on both sides assumed that the estoppel existed. But the

estoppel protected the trust company only to the extent of the damage that it would sustain from the enforcement of Le Roy's rights. After the payment of Swift's debt, this damage was nothing. If property of A. comes into the possession of B., B. cannot refuse to deliver it up to A. merely because, as the result of A.'s representations that it is the property of C., B. has been led to lend C. money on the pledge of it. To retain the property as against A., B. must show that its delivery to A. would damage himself. After the payment of Swift's debt, had the certificate then been in existence in the hands of the trust company, Le Roy could have recovered it after proper demand, and perhaps after another tender to Swift of his debt. After the sale of the stock by the trust company, its proceeds, or the balance of them over Le Roy's debt to Swift, could have been recovered by Le Roy from the trust company. No one had any claim to the balance but Le Roy; not the trust company, which was bound to pay the money to some one, and so was unprotected by Le Roy's estoppel; and not Swift, who, after tender, had no right to the proceeds of Le Roy's stock, but only to the amount of his debt. The balance of the proceeds of Le Roy's stock was therefore Le Roy's property,—money had and received by the trust company to his use. Before the trust company paid the money to Dickson, Dickson knew the situation. He knew that the proceeds of Le Roy's stock which he was receiving from the trust company belonged to Le Roy. In the ordinary sense, Dickson was not trustee, nor Le Roy cestui que trust, of these proceeds. Dickson's situation was that of a man who, without criminal intent, but without legal right, takes into his possession the proceeds of the property of another. He should have handed the balance over to Le Roy, or, if he desired time for investigation, should have earmarked the proceeds by a separate deposit of them. Instead of this, he mingled them with funds belonging to him as Swift's assignee. Whether he did this as claiming a right to the funds, or merely by way of convenience, does not appear. To deposit in the same bank account funds held in different rights is often done for a short time by men who intend no illegal act. None of the money deposited, so far as appears, belonged to Dickson individually. Whether Dickson's constant retention in the account of an amount of money equal to the proceeds of Le Roy's stock came about by reason of his deliberate intention to have this money always on hand, or merely because the demands upon him as assignee did not exhaust the money which belonged to him as assignee, does not appear. In the absence of evidence, it may fairly be assumed that Dickson intended to do what was right, and to retain the proceeds for their true owner. Even if, however, it could be shown affirmatively that Dickson intended to assert ownership in Le Roy's money, and even if the retention was merely accidental, yet I understand it to be a principle of law that where one deposits in a bank the money of another, together with money of his own, and always retains in the account an amount equal to the money belonging to the other person, then that money so retained can be recovered by its owner from the depositor's estate in bankruptcy. The case is somewhat stronger where, as here,

the depositor mingled, not his own private property and that of another, but the property of another and property belonging to him in a representative capacity. As was said by Lord Justice Thesiger in Re Hallett's Estate, 13 Ch. Div. 696, 723:

"Wherever a specific chattel is intrusted by one man to another, either for the purposes of safe custody or for the purpose of being disposed of for the benefit of the person intrusting the chattel, then either the chattel itself, or the proceeds of the chattel, whether the chattel has been rightfully or wrongfully disposed of, may be followed at any time, although either the chattel itself, or the money constituting the proceeds of that chattel, may have been mixed and confounded in a mass of the like material."

See, also, Birt v. Burt, 11 Ch. Div. 773, note. See 13 Ch. Div. 721. The cases in this country and in England, decided since In re Hallett's Estate, so far from calling in question that decision and the opinions rendered therein, have approved them repeatedly. In England it seems to have been held, indeed, that where, in a case like this, the second pledgee had sold the property of the pledgor, and paid his debt from the proceeds, retaining in specie some property of the original pledgee, yet the pledgor had a lien for the value of his property upon the property of the original pledgee still remaining in the second pledgee's hands. Ex parte Alliton, 1 Glyn & J. 160; Ex parte Salting, 25 Ch. Div. 148. So, in Harris v. Truman, 7 Q. B. Div. 340, the principal was allowed to retain goods purchased, not with the principal's money, but, as was said by Mr. Justice Bowen, "fraudulently substituted by the bankrupt in the place of the barley that should have been so purchased." These cases go further than does the case at bar. In this country, again, a special deposit made in a bank has been followed into the bank's general cash balance, in cases where that balance had never been reduced below the amount of the special deposit. See Moreland v. Brown, 30 C. C. A. 23, 86 Fed. 257; Merchants' Nat. Bank v. School Dist. No. 8, 36 C. C. A. 432, 94 Fed. 705; Spokane Co. v. First Nat. Bank, 16 C. C. A. 81, 68 Fed. 979. It is not necessary to discuss these last-mentioned cases, and others like them. The case of a special deposit mingled in one bank account with funds belonging to the depositor is not precisely the same as that of a special deposit mingled with the general cash balance of a bank. In Pennell v. Deffell, 4 De Gex. M. & G. 372, it was decided that checks drawn on a bank account composed of mingled moneys should be first applied to the withdrawal of the money first deposited. How that rule would work in the case at bar does not appear, but it seems to have been definitely overruled in England by In re Hallett's Estate, in spite of the dissenting opinion of Lord Justice Thesiger. Apparently, the rule of Pennell v. Deffell has not found much favor in this country. It is, indeed, highly artificial, and is applicable only where other tests have failed,—where there is no other reason to apply checks to one class of moneys rather than to another.

Counsel for the trustee urged that Le Roy ought not to recover, because, by reason of the use of Le Roy's stock Swift was enabled to borrow more money from the trust company, and so his debts were increased. Hence counsel urged that it would be inequitable

to permit the assets in the hands of the trustee to be diminished by paying Le Roy in full. This argument fails for two reasons: In the first place, because the increase in Swift's debts was accompanied by a corresponding increase in his assets. If there is a presumption of law that, by reason of his ability to pledge Le Roy's stock, his indebtedness at the time of his failure was greater than it would otherwise have been, the same presumption of law establishes that at the time of his failure he had greater assets than he would otherwise have had. Either presumption may not correspond precisely with the facts, but one is as reasonable as the other, and they stand or fall together. Second, if the doctrine thus contended for be sound, it would be equally applicable had the trust company returned Le Roy's original certificate to Dickson; yet it is clear beyond a doubt that in such a case Le Roy could have recovered the specific stock. The judgment of the referee is reversed, and judgment is to be entered in accordance with this opinion.